<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| NIKE, INC.,<br><br>  Plaintiff,<br><br>v.<br><br>GLOBAL HEARTBREAK LLC and<br>NAADIER RILES,<br><br>  Defendants. | Civil Action No. 24-476 (MAS) (RLS)<br><br>**MEMORANDUM OPINION** |

<u>**SHIPP, District Judge**</u>

This matter comes before the Court on an unopposed Motion for Default Judgment by Plaintiff Nike, Inc. ("Nike" or "Plaintiff") against Global Heartbreak LLC ("Global Heartbreak") and Naadier Riles ("Riles") (collectively "Defendants"). (ECF No. 7.) The Court has carefully considered the parties' submissions and decides the matter without oral argument under Local Civil Rule 78.1(b). For the reasons set forth herein, Nike's motion is granted in part and denied in part.

**I.   BACKGROUND**

  **A.   Factual Background[1]**

Nike is the largest seller of athletic footwear in the world. (Compl. ¶ 22, ECF No. 1.) The instant case concerns Nike's Air Jordan 1, a sneaker that Nike developed in 1984 for Michael Jordan during his rookie year in the NBA. (*Id.* ¶ 26.) The sneakers garnered "significant publicity"

---

[1] For the purpose of this unopposed default judgment motion, the Court assumes as true all allegations in the complaint, except legal conclusions and allegations regarding damages. *See DIRECTV, Inc. v. Pepe*, 431 F.2d 162, 165 n.6 (3d Cir. 2005) (citing *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990)).

because Michael Jordan wore the sneakers despite a warning from the NBA that they violated its uniform rules. (*Id.* ¶ 27-28.) A few weeks after the NBA issued this warning, Air Jordan 1 advertisements began to air nationally. (*Id.*) The following year, when Nike released the Air Jordan 1 sneakers to the general public, they immediately sold out. (*Id.* ¶ 29.) While originally marketed in the basketball context, today the Air Jordan 1 is also "a lifestyle symbol and fashion icon," and Nike avers that the Air Jordan 1 is, to date, one of the "most famous and influential sneaker designs of all time." (*Id.* ¶ 30.)

Nike "owns all right, title, and interest" in the United States Patent and Trademark Office ("USPTO") Trademark Registrations for the trade dress of the Air Jordan 1 High silhouette (Reg. No. 6,368,694) and the Air Jordan 1 Outsole design (Reg No. 3,721,064) (the "Asserted Marks"). (Compl. ¶ 31; Ex. 1 at 2, ECF No. 1-1; Ex. 2 at 2, ECF No. 1-2.) Nike maintains "strict quality control standards" and inspects and approves products bearing the Asserted Marks before their distribution and sale. (*Id.* ¶ 32.) It also maintains strict control over the use of the Asserted Marks more generally to control Nike's "business reputation and goodwill" by regulating how many products bear the Asserted Marks and where and when such products are released. (*Id.* ¶ 33.) Nike additionally maintains that it has developed powerful trademark rights through "long-standing promotion, substantial sales, and consumer recognition." (*Id.* ¶ 25.) It has spent "decades" building this goodwill and asserts that "[h]aving distinctive trademarks that are readily identifiable is an important factor in creating a market for Nike's products, in identifying Nike and its brands, and in distinguishing Nike's products from the products of others." (*Id.* ¶¶ 10, 24.) Nike sells its footwear "directly to consumers through Nike-owned retail stores and digital platforms," to retail accounts, and to "a mix of independent distributors, licensees, and sales representatives in virtually all countries around the world." (*Id.* ¶ 23.)

Global Heartbreak is a New Jersey limited liability company that Riles founded and owns. (*Id.* ¶¶ 13-15.) On December 12, 2023, Nike became aware of Global Heartbreak's Air Global sneaker through a video published by ReasonTV. (*Id.* ¶¶ 3, 39.) That same day, Riles posted on Twitter that Nike was suing him and indicated that he nevertheless still intended to sell the Air Global sneakers. (*Id.* ¶ 38.) Global Heartbreak sells its "Air Global" sneakers through its website and social media platforms; specifically, Instagram and Facebook. (*Id.* ¶ 37.) The following pictures show the Air Jordan 1 sneaker and Nike's Asserted Marks (left) and Global Heartbreak's Air Global sneaker (right).



(*Id.* ¶ 35.)

At the time of the ReasonTV video, Nike had not initiated a lawsuit or otherwise contacted Riles. (*Id.* ¶ 39) Shortly after becoming aware of the Air Global, however, Nike initiated contact by sending a cease-and-desist letter to Global Heartbreak on January 3, 2024, requesting: (1) that the distribution, marketing, and sale of the allegedly infringing products cease; and (2) information regarding the number of infringing products sold, the number in inventory, and the manufacturer.

(*Id.*) Two days later, Riles posted the cease-and-desist letter to his Instagram account with the caption, "this is what I had to do to get the recognition that I deserved." (*Id.* ¶ 40.)

After a phone call with Nike on January 9, 2024, (*id.* ¶ 41), Riles posted portions of a follow-up interview with ReasonTV on his social media accounts in which he stated he "use[d] Nike's silhouette to get noticed" (*Id.* ¶¶ 41-42). On January 20, 2024, Riles provided Nike with the information it requested in the cease-and-desist letter, including "the amount of knockoffs sold, and the amount of knockoffs remaining in inventory." (*Id.* ¶ 43.) Four days later, Nike asked Riles for assurances that he would stop using Nike's designs and inform his followers on social media platforms of the same. (*Id.* ¶ 44.) Riles instead posted on social media demanding a better offer from Nike and threatening to continue selling the sneakers, stating "I'll drop a 100 more." (*Id.*)

**B.      Procedural Background**

Nike filed a Complaint against Defendants on January 25, 2024 for damages and injunctive relief, alleging trademark infringement under the Lanham Act (Count I), false designation of origin/unfair competition under the Lanham Act (Count II), trademark dilution under the Lanham Act (Count III), common law trademark infringement and unfair competition (Count IV), trademark infringement under New Jersey state law (Count V), unfair competition under New Jersey state law (Count VI), and trademark dilution under New Jersey state law (Count VII). (*See generally* Compl.) Service of process was effectuated on Defendants on March 3, 2024. (ECF Nos. 4, 5.) Defendants failed to answer or otherwise appear in this action, and upon Nike's request, the Clerk of Court entered an Entry of Default against Defendants on April 5, 2024. (ECF No. 6.) Nike subsequently submitted the instant Motion for Default Judgment. (ECF No. 7.) Defendants still have not answered or otherwise appeared.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 55[2] authorizes a court to enter default judgment "against a properly served defendant who fails to file a timely responsive pleading." *La. Counseling & Fam. Servs., Inc. v. Makrygialos, LLC*, 543 F. Supp. 2d 359, 364 (D.N.J. 2008) (citing Fed. R. Civ P. 55(b)(2); *Anchorage Assocs. v. V.I. Bd. of Tax Rev.*, 922 F.2d 168, 177 n.9 (3d Cir. 1990)). Entry of default judgment is left to the district court's discretion. *See Hritz v. Woma Corp.*, 732 F.2d 1178, 1180 (3d Cir. 1984). A default judgment is a disfavored remedy because it does not resolve a plaintiff's claims on the merits. *See Loc. 365 Pension Fund v. Kaplan Bros. Blue Flame Corp.*, No. 20-10536, 2021 WL 1976700, at *2 (D.N.J. May 18, 2021) (quoting *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194 (3d Cir. 1984)).

Three analyses guide the Court's discretion. *See Victory's Dawn, Inc. v. Clemons*, No. 21-9744, 2022 WL 3402491, at *2 (D.N.J. Aug. 12, 2022). *First*, where a defendant fails to respond to a complaint, the Court must ensure that the plaintiff properly served the defendant. *See Gold Kist, Inc. v. Laurinburg Oil Co.*, 756 F.2d 14, 19 (3d Cir. 1985). *Second*, the Court must ensure that "the unchallenged facts" in the complaint give rise to a "legitimate cause of action." *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 536 (D.N.J. 2008) (quoting *DIRECTV, Inc. v. Asher*, No. 03-1969, 2006 WL 680533, at *1 (D.N.J. Mar. 14, 2006)). In conducting that assessment, the Court assumes as true all allegations in the complaint, except legal conclusions and allegations regarding damages. *See DIRECTV, Inc.*, 431 F.2d at 165 n.6 (citing *Comdyne I, Inc.*, 908 F.2d at 1149). *Third*, the Court must determine whether default judgment is appropriate by weighing three factors: "(1) whether the defaulting party has a meritorious defense; (2) the

---

[2] All references to a "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

prejudice suffered by the plaintiff seeking default; and (3) the defaulting party's culpability in bringing about default." *Trs. of UFCW Loc. 152 Health & Welfare Fund v. Avon Food, Inc.*, No. 17-2178, 2018 WL 372167, at *3 (D.N.J. Jan. 11, 2018) (citing *Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 73 (3d Cir. 1987)).

### III.   DISCUSSION

#### A.   Default Judgment

Plaintiff brought this Motion for Default Judgment after receiving the Clerk's Entry of Default. (*See generally* ECF No. 7.) Defendant has not opposed and still has not otherwise appeared. For the reasons stated below, the Court grants in part and denies in part Plaintiff's Motion.

##### 1.   *Plaintiff's Service Was Proper*

The Court must first determine whether Plaintiff properly served Defendants. Plaintiff has provided Proof of Service of Summons and Complaint evidencing that service was effectuated, (ECF No. 5), and the Court has already entered a Clerk's Entry of Default against Defendants (ECF No. 6). As nothing in the record indicates otherwise, the Court concludes that service was proper.

##### 2.   *Legitimate Causes of Action*

Nike has alleged sufficient facts to give rise to a legitimate cause of action for each Count alleged in the Complaint, as explained below.

###### a.   **Trademark Infringement and False Designation of Origin/Unfair Competition Claims (Counts I, II, IV-VI)**

The Court evaluates claims for federal trademark infringement (Count I); federal false designation of origin/unfair competition (Count II); common law trademark infringement and unfair competition (Count IV); state law trademark infringement (Count V); and state law unfair competition (Count VI) together because the elements for federal trademark infringement and false

6

designation of origination/unfair competition under the Lanham Act are "identical," *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000), and the same as "claims of trademark infringement and unfair competition under New Jersey statutory and common law." *J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 374 (D.N.J. 2002). As such, the Court focuses on the Lanham Act trademark infringement analysis.

To establish a legitimate cause of action for trademark infringement, Plaintiff must establish that "(1) their marks are valid and legally protectable; (2) they own the marks; and (3) defendants' use of their marks to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Prime Hookah Inc. v. FCM Online LLC*, No. 21-13915, 2022 WL 1115361, at *2 (D.N.J. Apr. 14, 2022) (citing *Checkpoint Sys., Inc. v. Check Point Software Tech., Inc.*, 269 F.3d 270, 279 (3d Cir. 2001)).

A certificate of registration from the USPTO establishes elements one and two because "federal registration of a trademark is prima facie evidence of the mark's validity [and] the registrant's ownership of the mark . . . ." *Kars 4 Kids Inc. v. Am. Can!*, 98 F.4th 436, 448 (3d Cir. 2024) (quoting *Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.*, 186 F.3d 311, 315 (3d Cir. 1999)). Here, Nike attached copies of the certificate of registration for the Air Jordan 1 High silhouette and the Air Jordan 1 outsole design and asserts that it "owns all right, title, and interest in the [Registrations]." (Compl. ¶ 31; Ex. 1 at 2; Ex. 2 at 2). As such, Nike has satisfied the first two requirements for a legitimate claim of trademark infringement.

The third requirement—likelihood of confusion—is found "when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Dranoff-Perlstein Assocs. v.*

7

*Sklar*, 967 F.2d 852, 862 (3d Cir. 1992) (quoting *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 (3d Cir. 1991)). Likelihood of confusion is evaluated based on the following factors:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; [and] (10) other factors suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand in that market.

*E.A. Sween Co. v. Deli Exp. of Tenafly, LLC*, 19 F. Supp. 3d 560, 569 (D.N.J. 2014) (quoting *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 471 (3d Cir. 2005)). This test is a "qualitative inquiry," as the "different factors may properly be accorded different weights depending on the particular factual setting," and "[n]ot all factors will be relevant in all cases." *Freedom Card*, 432 F.3d at 471 (quoting *A & H Sportswear, Inc.*, 237 F.3d at 215).

The first factor, mark similarity, is "the single most important factor in determining likelihood of confusion." *A & H Sportswear*, 237 F.3d at 216. This factor is satisfied if "'ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection[,] or sponsorship.'" *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 713 (3d Cir. 2004) (alteration in original) (quoting *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 477 (3d Cir. 1994)). Moreover, if the goods are in direct competition, "the court need rarely look beyond the mark itself," as the analysis turns on whether the marks are "confusingly similar." *Chanel, Inc. v. Matos*, 133 F. Supp. 3d 678, 685 (D.N.J. 2015) (quotations omitted) (quoting *Fisons Horticulture*, 30 F.3d at 473).

8

Here, Plaintiff and Defendants sell the same product—sneakers—and both parties sell their product, at least in part, through digital channels. (*See generally* Compl.) As demonstrated by the pictures below, the Air Global sneaker has an extremely similar, if not identical, silhouette, paneling, and sole as the Asserted Marks. (Compl. ¶ 36.)



(*Id.* ¶ 35.) Nike avers that Defendants' sneakers are "likely to confuse, mislead, or deceive customers, purchasers, and members of the general public as to the origin, source, sponsorship, or affiliation . . ." and are "likely to cause such people to believe in error that Defendants' [Air Global sneakers] have been authorized, sponsored, approved, endorsed or licensed by Nike or that the Defendants are in some way affiliated with Nike." (Compl. ¶ 57.) These allegations are sufficient to establish a legitimate cause of action for trademark infringement, and the Court accordingly grants Plaintiff's motion for default judgment as to Counts I, II, IV, V, and VI.

    b.  **Trademark Dilution Claims (Counts III and VII)**

The Court evaluates Plaintiff's federal and state trademark dilution claims together because they "are subject to the same considerations." *E.g., 800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 294 (D.N.J. 2006). Trademark dilution "grants extra protection to strong,

well-recognized marks even in the absence of a likelihood of consumer confusion . . . if the defendant's use diminishes or dilutes the strong identification value associated with the plaintiff's famous mark." *Times Mirror Mags., Inc. v. Las Vegas Sports News, LLC*, 212 F.3d 157, 163 (3d Cir. 2000) (citing 4 McCarthy on Trademarks and Unfair Competition § 24:70 (4th ed. 1997)). Dilution by blurring is "association arising from the similarity between a mark . . . and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). In the Third Circuit, a plaintiff must satisfy the following elements to establish trademark dilution:

> (1) The plaintiff is the owner of a mark that qualifies as a "famous" mark . . .[;] (2) The defendant is making commercial use in interstate commerce of a mark or trade name[;] (3) [d]efendant's use began after the plaintiff's mark became famous[;] and (4) [d]efendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services.

*Times Mirror*, 212 F.3d at 163. Nike has sufficiently alleged each of these factors.

*First*, a mark becomes famous when it is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). To qualify as a famous mark, the Third Circuit evaluates eight factors, including: (1) distinctiveness; (2) duration of the use of the mark; (3) duration of advertising and publicity of the mark; (4) the geographical range of the mark; (5) the channels of trade used, (6) the recognition of the mark in trade areas; (7) the nature and extent of the use of similar marks by third parties; and (8) whether the mark was registered. *Times Mirror*, 212 F.3d at 163 (citing 15 U.S.C. § 1125(c)(1)(A)-(H)).

Here, Nike has established that the Asserted Marks qualify as famous.[3] Nike has properly alleged that it designed the Air Jordan 1 in 1984, advertisements began shortly thereafter, it engages

---

[3] The Court also "takes judicial notice that the Nike brand is widely recognized in the general consuming public." *Nike, Inc. v. E. Ports Custom Brokers, Inc.*, No. 11-4390, 2018 WL 3472628, at *12 (D.N.J. July 19, 2018).

in "worldwide marketing and selling," and sells its footwear in retail stores and through digital platforms and other distributors. (Compl. ¶¶ 21, 23, 26.) Nike further alleges that the Asserted Marks are registered, and the Air Jordan 1 "continues to be recognized as having one of the most famous and influential sneaker designs of all time." (*Id.* ¶¶ 30-31.) Plaintiff "maintains strict quality control standards for its products bearing the Asserted Marks" and "over the use of the Asserted Marks." (*Id.* ¶¶ 32-33.) Nike additionally demonstrates its commitment to limiting the use of similar marks by third parties by maintaining that it "takes [the obligation to enforce rights against knockoffs] seriously." (*Id.* ¶ 5.) As such, Nike has established that the Asserted Marks are famous.

*Second*, the use in interstate commerce requirement is satisfied once an allegedly infringing mark has some interstate commercial activity, though "the quantum of commercial activity needed to demonstrate interstate commerce is not great . . . ." *Coach, Inc. v. Bags & Accessories*, No. 10-2555, 2011 WL 1882403, at *4 (D.N.J. May 17, 2011). Here, Defendants sell the Air Global sneakers on their website and social media platforms, which "by their very nature, involve interstate commerce." *Rolls-Royce Motor Cards Ltd. v. Davis*, No. 15-0417, 2016 WL 3913640, at *8 (D.N.J. Mar. 11, 2016).

Even if an online store was not sufficient, however, intrastate commercial activity may also satisfy this requirement if it has "a substantial effect, economic or otherwise, upon plaintiff[']s interstate use of the mark." *E.A. Sween*, 19 F. Supp. 3d at 574 (citation omitted) (finding that the plaintiff's mark and the associated goodwill were "an essential element of its nationwide sales" and, therefore, even a local erosion of the mark would affect interstate commerce). Nike has alleged that it "maintains strict control over the use of the Asserted Marks in connection with its products so that Nike can maintain control over its related business reputation and goodwill."

(Compl. ¶ 33.) It has spent "decades" building this goodwill and asserts that "[h]aving distinctive trademarks that are readily identifiable is an important factor in creating a market for Nike's products, in identifying Nike and its brands, and in distinguishing Nike's products from the products of others." (*Id.* ¶¶ 10, 24.) These facts allow the Court to infer that the Asserted Marks and associated goodwill are an "essential element of [Nike's] nationwide sales." *E.A. Sween*, 19 F. Supp. 3d at 574. Plaintiff has accordingly satisfied the use in interstate commerce element.

*Third*, Nike alleges that the Asserted Marks "became famous before the Defendants used the marks," satisfying the requirement that Plaintiff's marks be first in time. (Compl. ¶ 72.)

*Fourth*, Nike must demonstrate that "Defendant[s'] use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services." *Times Mirror*, 212 F.3d at 168. Dilution requires an evaluation of the following factors: "[1] similarity of the marks[;] [2] similarity of the products covered by the marks[;] [3] sophistication of consumers[;] [4] predatory intent[;] [5] renown of the senior mark[; and] [6] renown of the junior mark." *Times Mirror*, 212 F.3d at 163 (citation omitted). Courts can supplement these factors with the *Nabisco* factors: "actual confusion and likelihood of confusion, shared customers and geographic isolation, the adjectival quality of the junior use, and the interrelated factors of duration of the junior use, harm to the junior user, and delay by the senior user in bringing the action." *Times Mirror*, 212 F.3d at 168 (quoting *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 227 (2d Cir. 1999)).

Here, the similarity of marks, the similarity of products, the renown of the mark, and likelihood of confusion have already been established above in Nike's favor. Nike also took immediate steps to block the infringement by writing a cease-and-desist letter, requesting information regarding the infringing products, and speaking directly with Riles. (Compl. ¶¶ 39,

12

41.) When these efforts did not resolve the conflict, Nike initiated suit within a month of first contact. (*See generally* Compl.)

Nike has demonstrated Defendants' predatory intent or willfulness through a number of Riles's actions. (*See* Compl ¶¶ 36-44.) In the first instance, Riles posted on social media that Nike was suing him for infringement approximately three weeks *before* Nike actually sent a cease-and-desist letter, presumably to manufacture publicity for his brand. (*Id.* ¶ 38.) After Nike sent the cease-and-desist letter, Riles posted the letter to social media and stated, "this is what I had to do to get this recognition that I deserved[,]" and a few weeks later, Riles posted that he "use[d] Nike's silhouette to get noticed." (*Id.* ¶¶ 40, 42.) Riles also spoke to Nike's counsel after receiving the cease-and-desist letter, but he refused to stop selling the Air Global sneakers. (*Id.* ¶ 41.)[4] As Nike has sufficiently alleged that Defendants' use has lessened its capacity to identify and distinguish its goods, Nike has therefore established each element for trademark dilution, and default judgment is appropriate with regards to Counts III and VII.

### 3. *Appropriateness of Default Judgment*

In evaluating whether default judgment is appropriate, the Court looks at: (1) any meritorious defense; (2) whether Plaintiff suffers prejudice; and (3) Defendants' culpability in bringing about the default judgment. *Avon Food*, 2018 WL 372167, at *3 (citing *Bridges Fin. Grp., Inc. v. Beech Hill Co., Inc.*, No. 09-2686, 2011 WL 1485435, at *3 (D.N.J. Apr. 18, 2011)). *First*, Defendants failed to appear, such that there is no meritorious defense in the record. Upon closer inspection of the record itself, there appears to be no meritorious defense on the facts as alleged. (*See generally* Compl.) *Second*, Defendants have not answered or appeared, and so "Plaintiff

---

[4] The Court will not evaluate the sophistication of customers, renown of the junior, duration of junior use, nor harm to the junior user, as there are no facts alleged that would support any of these factors. (*See generally* Compl.)

suffers prejudice if it does not receive a default judgment because it has no alternative means of vindicating its claim against the defaulting party." *Avon Food, Inc.*, 2018 WL 372167, at *3. *Third*, Defendants' failure to appear "permits the Court to draw an inference of culpability on their part." *JUUL Labs, Inc. v. Zoey Trading LLC*, No. 21-19299, 2022 WL 970412, at *6 (D.N.J. Mar. 31, 2022). Since all three appropriateness factors are satisfied, service was proper, and Nike has established legitimate causes of action for all Counts, default judgment is appropriate.

### B.  Remedies

Having determined that Defendants are liable, the Court now considers the proper remedy. Plaintiff asks for a permanent injunction preventing Defendants from engaging in any purported infringing activity concerning the Asserted Marks, costs, and statutory damages in the amount of $4 million. (Compl., Prayer for Relief 30-31.) For the reasons below, Plaintiff's requests are granted in part and denied in part.

#### *1.  Injunction*

Plaintiff maintains that it is entitled to an injunction restraining Defendants from engaging in further acts of infringement. (Pl.'s Moving Br. 20.) To qualify for a permanent injunction, Plaintiff must meet four elements:

> "(1) that it has suffered an irreparable injury; (2) that the remedies available at law, such as monetary damages," prove inadequate to compensate for that injury; (3) that the balance of hardships between the plaintiff and defendant favor equitable relief; and (4) "that the public interest would not be disserved by a permanent injunction."

*Matos*, 133 F. Supp. 3d at 689 (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Free Speech Coal, Inc. v. Att'y Gen.*, 974 F.3d 408, 430 (3d Cir. 2020) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)). To that end, the Court must be careful not to presume irreparable harm because injunctive relief "may only be awarded upon a

14

clear showing that the plaintiff is entitled to such relief." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 217 (3d Cir. 2014) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). In applying that standard, the Court is especially cautious in awarding a permanent injunction in the default judgment context. Without the benefit of any opposition, the Court must ensure itself that Plaintiff has properly demonstrated the necessity of a permanent injunction. Otherwise, default judgment could serve as an end run around the "high burden placed on the moving party to establish that an injunction is warranted . . . ." *Mallet & Co. v. Lacayo*, 16 F.4th 364, 391 (3d Cir. 2021) (citing *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988)).

This Court has previously held that once a likelihood of confusion has been established, "the inescapable conclusion is that there was also irreparable injury," which satisfies the first factor, and the public's right not to be confused has been violated, which satisfies the fourth factor. *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805, 805-07 (3d Cir. 1998). The second element is established here because while a remedy at law would provide some relief, it would not adequately compensate Nike for the reputational and goodwill injury associated with the distribution of infringing goods, nor would it prevent future trademark infringement. *See Matos*, 133 F. Supp. 3d at 689. With respect to the third factor, a balancing of the hardships favors injunctive relief here where "the injunction sought only requires Defendant[s] to abide by the law and to refrain from infringing the federally protected [Asserted Marks]," while Plaintiff faces a loss of reputation and goodwill associated with the Asserted Marks. *Id.* As all four elements are met, the Court hereby grants Nike's request for an injunction restraining Defendants from engaging in further acts of infringement.

### 2. *Costs*

Plaintiff asks for costs in the amount of $2,930.00, which reflects the costs associated with filing this action and with multiple service attempts. (Pl.'s Moving Br. 21.) Under 15 U.S.C. § 1117, a plaintiff may recover "the costs of the action" if the defendants committed a "violation under section 1125(a)." *See Louis Vuitton Malletier, S.A. v. Mosseri*, No. 07-2620, 2009 WL 3633882, at *4 (D.N.J. Oct. 28, 2009) (explaining "the Lanham Act permits an award of costs whenever a plaintiff establishes trademark infringement"). Here, as discussed above, Plaintiff has established a claim for trademark infringement against Defendants under 15 U.S.C. § 1125(a). The Court, therefore, awards Nike reasonable fees and costs of $2,930.00.

### 3. *Statutory Damages*

Plaintiff has elected to request statutory damages as opposed to actual damages because Defendants' lack of answer or appearance makes actual damages difficult to calculate at this stage. (Pl.'s Moving Br. 10, 17; *see also* Compl. p. 31.) Nike asks for $4 million pursuant to § 1117(c) of the Lanham Act. (Pl.'s Moving Br. 17.) The Court, however, is unable to ascertain the damages based on the current record. The Court hereby denies Nike's request for statutory damages without prejudice and will provide Plaintiff the opportunity to submit a supplemental submission addressing each of the copyright infringement factors,[5] to allow the Court to make a meaningful assessment of damages. Nike's supplemental submission should include information that it does have related to damages. For example, Nike states that "[o]n January 20, 2024, Riles provide [the

---

[5] This Court has adopted the copyright infringement factors to determine a statutory damages award: "(1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the [trademark]; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produces; and (7) the potential for discouraging the defendant." *E. Ports Custom Brokers, Inc.*, 2018 WL 3472628, at *13.

16

information Nike requested in its cease-and-desist letter], including . . . the amount of knockoffs sold, and the amount of knockoffs remaining in inventory." (Compl. ¶ 43.) Nike, however, did not provide this information to the Court in support of its Motion. Statutory damages must "bear some relation to the actual damages suffered," and without additional information, the Court cannot make such a determination. *Coach, Inc.*, 2011 WL 1882403, at *6 (quoting *Bly v. Banbury Books, Inc.*, 638 F. Supp. 983, 987 (E.D. Pa. 1986)).

## IV.   CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Default Judgment is granted in part and denied in part. An Order consistent with this Memorandum Opinion will follow.

/s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE